**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Gregory A. BAKER, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 9, 1998.
Filed Dec. 23, 1998.

Andrew J. Goncharoff, York, for appellant.

Susan R. Emmons, Asst. District Atty., York, for Com., appellee.

Before CAVANAUGH, DEL SOLE, JOHNSON, HUDOCK, EAKIN, STEVENS, MUSMANNO, ORIE MELVIN, and LALLY–GREEN, JJ.

DEL SOLE, J.:

This is a direct appeal from a judgment of sentence directing Appellant to serve a period of six months incarceration for his conviction of indirect criminal contempt. Appellant contends that there is insufficient evidence, under the particular facts of this case, to support his conviction. We vacate the judgment of sentence and reverse the conviction.

The charge against Appellant stemmed from the issuance of an order in response to a petition for protection from abuse filed by Appellant's ex-girlfriend. In accordance with the provisions of the Protection From Abuse Act, (PFA) 23 Pa.C.S.A. §§ 6101–6118, the court issued an *ex parte* temporary order and set a hearing date within ten days, at which time the plaintiff was to prove the allegations of abuse by a preponderance of the evidence. 23 Pa.C.S.A. § 6107(a). The petition was later dismissed when the plaintiff failed to appear at the permanent hearing. However, Appellant was charged with contempt of court for conduct he exhibited when he was advised of the temporary order.

Two deputy sheriffs served a copy of the temporary order on Appellant, who was incarcerated in the York County Prison. The deputies testified they read and explained the order to Appellant and he complied with their request to sign the document. However, as Appellant was departing he remarked in the presence of the deputies, "I'm going to kill this bitch." The deputies did not convey this statement to the plaintiff, but did file indirect criminal contempt charges against Appellant for violating the temporary PFA order. A hearing was held and Appellant was found guilty of indirect criminal contempt and sentenced to six months imprisonment.

The sole question raised on appeal is whether Appellant's statement made in the presence of the officers while in custody, but not conveyed to the plaintiff, constituted conduct in violation of the temporary order for which he could be found guilty of contempt.

We begin by recognizing the importance of the purposes of the Protection From Abuse Act. Hailed as a vanguard measure to deal with problems of abuse, the act was designed to advance the prevention of physical and sexual abuse. *Eichenlaub v. Eichenlaub*, 340 Pa.Super. 552, 490 A.2d 918 (Pa.Super.1985); *Cipolla v. Cipolla* 264 Pa.Super. 53, 398 A.2d 1053 (Pa.Super.1985). In an effort to prevent domestic violence it concomitantly promotes the security of the home. *Commonwealth v. Majeed*, 548 Pa. 48, 694 A.2d 336 (Pa.1997). Because every individual has a right to feel secure in their home and to be free of violence, our Commonwealth has seen fit to provide these measures for the protection of its citizens.

In view of these concerns, the court in this matter issued a temporary protection from abuse order against Appellant. Appellant was charged with contempt for violating the terms of that order. A charge of indirect criminal contempt consists of a claim that a violation of an order or decree of court occurred outside the presence of the court. *Brocker v. Brocker*, 429 Pa. 513, 241 A.2d 336 (Pa.1968). Where a PFA order is involved, an indirect criminal contempt charge is designed to seek punishment for a violation of the protective order. *Commonwealth v. Nelson*, 456 Pa.Super. 349, 690 A.2d 728 (Pa.Super.1997). The "role of criminal contempt and that of many ordinary criminal laws seem identical—protection of the institutions of our government and enforcement of their mandates." *Diamond v. Diamond*, 715 A.2d 1190, 1195 (Pa.Super.1998). Thus, as with those accused with other crimes, one charged with indirect criminal contempt is to be provided the safeguards which statute and criminal procedures afford. *Crozer–Chester Med-*

*ical Center v. Moran*, 522 Pa. 124, 560 A.2d 133, 137 (Pa.1989).

■ In considering the sufficiency of the evidence to support a finding of criminal contempt for failure to comply with a court order, four elements must be present:

(1) the order must be definite, clear, specific and leave no doubt or uncertainty in the mind of the person to whom it was addressed of the conduct prohibited; (2) the contemnor must have had notice of the specific order or decree, (3) the act constituting the violation must have been volitional, and (4) the contemnor must have acted with wrongful intent.

*Diamond v. Diamond*, 715 A.2d at 1196.

■ The temporary order issued in this case provided:

The Defendant shall refrain from abusing, harassing, threatening and stalking the Plaintiff or placing her in fear of abuse in any place where she may be found.

The order also advises the defendant that any violation "of this order shall constitute contempt of court." Thus, the question becomes whether Appellant's statement violated the terms of this order.

Appellant argues that his comment was not a threat, rather he was "doing nothing more than venting his frustration." Appellant's Brief at 10. He notes that the Crimes Code does not define the word "threat," and that the criminal offense which does concern threats, captioned "Terroristic Threats," requires the actor to have an intent to terrorize or cause serious public inconvenience. He remarks that no such intent can be shown in this case where the subject of the alleged threat never learned of its existence, and where he was incarcerated at the time the statement was made.

The Commonwealth argues that 1 Pa. C.S.A. § 1903 requires that words not specifically defined by statute be defined by common and approved usage. It notes that the trial court stated it was applying the definition found in the *American Heritage Dictionary*, defining the word threat as an expression of an intention to inflict pain, injury or evil. It also refers to the definition of threat found in BLACK'S LAW DICTIONARY 1327 (5 th ed.1981), which defines "threat" as "[a] communicated intent to inflict physical or other harm on any person or on property." Because Appellant's comment was communicated to the sheriff deputies, the Commonwealth submits that it fulfills the definition of a threat.

While Appellant's comment may satisfy the dictionary definition of a threat as suggested by the Commonwealth, we conclude that Appellant cannot be convicted of a crime based on conduct which is not clearly defined as prohibited. As we noted, an order underlying a contempt charge must be definite, clear, specific and leave no doubt or uncertainty as to what conduct is prohibited. *Diamond v. Diamond*, 715 A.2d at 1196. This requirement is critical because Appellant has been charged with a crime for violating that order. The order directs that Appellant not threaten the plaintiff or put her in fear, however, as evidenced by the parties' divergent interpretations, uncertainty remains as to what type of communication is prohibited, to whom it must be communicated, and whether an element of intent must be established.

■ The necessity that the order clearly and specifically set forth the prohibited conduct is in keeping with the requirement that penal statutes may not be unconstitutionally vague. A penal statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and that it be done in a manner that does not encourage arbitrary and discriminatory enforcement. *Commonwealth v. Hendrickson*, 453 Pa.Super. 533, 684 A.2d 171 (Pa.Super.1996). This is particularly true when the conduct to be prohibited may be constitutionally protected speech.

■ "When engaged in a constitutionally protected activity of the fundamental nature of freedom of speech, we must exercise restraint in prohibiting the activity lest we destroy the right." *Commonwealth v. Gowan*, 399 Pa.Super. 477, 582 A.2d 879, 882 (Pa.Super.1990). However, the right to free speech is not absolute, and certain well-defined, limited classes of speech may be prevented and punished without raising constitu-

tional problems. *Commonwealth v. Duncan,* 239 Pa.Super. 539, 363 A.2d 803, 806 (Pa.Super.1975). Lewd, obscene, profane, libelous and insulting or "fighting words those which by their very utterance inflict injury or tend to incite an immediate breach of peace" are not constitutionally protected. *Id.* (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571–72, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942)). Only "true threats" fall within that group of expressions, such as fighting words, which are not constitutionally protected "pure speech." *U.S. v. Maxton,* 940 F.2d 103, 105 (4th Cir.1991). A true threat is one which "on its face and in the circumstances in which it is made is so unequivocal, unconditionally immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." *United States v. Kelner,* 534 F.2d 1020, 1027 (2d Cir.1976).

While we have no difficulty concluding the statement made by Appellant in the presence of the deputies can be viewed as threatening in nature, we find the trial court order which Appellant was convicted of violating can be interpreted to permit this statement, as long as it did not occur in the plaintiff's presence or place her in fear. The order prohibited Appellant from "threatening . . . the Plaintiff or placing her in fear of abuse." Whether the order prohibited a threatening statement which merely referred to the plaintiff or whether such a statement had to be made in the plaintiff's presence or in some manner subject her to fear, is uncertain. Thus, we cannot say that the order clearly and specifically precluded the conduct exhibited by Appellant. Nor can it be argued that since the trial court judge, who entered the order and found Appellant guilty, knew what conduct was prohibited, the conviction should stand. It is necessary that the order be "definite, clear, specific and leave no doubt or uncertainty *in the mind of the person to whom it*

*was addressed* of the conduct prohibited." *Diamond v. Diamond,* 715 A.2d at 1196. (emphasis added).

In these circumstances we cannot find that Appellant had sufficient notice that a statement lacking any measure of immediacy, made outside the presence of the person to whom it would be directed, and which did not cause the protected person to feel threatened, constituted a violation of the court order.[1]

We have stated "a determination of criminal contempt is a criminal conviction conferring on the contemnor all the negative characteristics of being a convicted criminal. The right of a citizen to be free of the stigma of an unfounded criminal conviction is a hallmark of American jurisprudence." *Diamond v. Diamond,* 715 A.2d at 1195. Under the circumstances of this case we conclude the court erred in finding Appellant in indirect criminal contempt of its order, and we vacate his judgment of sentence.

Judgment of sentence vacated. Jurisdiction relinquished.

Judge EAKIN files a dissenting opinion in which Judge LALLY–GREEN joins and notes her dissent.

Judge ORIE MELVIN files a dissenting opinion in which Judge STEVENS joins.

EAKIN, J., dissenting:

The purpose of the terroristic threats statute is to prevent "the psychological distress that follows from an invasion of another's sense of personal security." *Commonwealth v. Tizer,* 454 Pa.Super. 1, 684 A.2d 597, 600 (1996). When considering whether personal security has been invaded, the victim's perception of the threat is relevant; security in this context is the perception of safety, which

---

1. The Dissent by Judge Orie Melvin apparently misreads our holding when she writes "[u]nder the majority's rationale, if after hearing appellant's statement the deputies immediately telephoned Ms. Banks and informed her of what they heard only then would appellant's statement constitute a threat." Dissenting Opinion at 725. Because the term "threat" remains undefined in this Commonwealth's Criminal Code and be-

cause the court's order was not clear and definite, we have not made any ruling, nor do we suggest that the conduct described by the Dissent would constitute a violation of the order. Rather, we rule that those seeking to limit another individual's speech by subjecting it to criminal sanctions via a prohibitive order must do so in a clear and definite manner.

is not diminished by uncommunicated threats.

However, the goal of a PFA order is different: it is cessation of abuse. 23 Pa.C.S. § 6108. To achieve this goal, this order unambiguously says "don't threaten the victim," but Baker clearly threatened to kill her.[1] As the proper goal of this order was to stop Baker from making abusive statements, it matters not whether it was made in her presence or communicated to her. That is, the Crimes Code deals with punishment for the conduct's consequence to the victim, (invading her security), while the PFA act aims at stopping the conduct itself. Given these distinct goals, the focus in this contempt proceeding must be on what Baker said, not who heard him say it. To prohibit only threats communicated to the victim renders the PFA order redundant; who needs a court order to say "Don't violate the Crimes Code?"

I join in dissent.

ORIE MELVIN, J., dissenting:

I believe appellant's conduct clearly constituted a threat and therefore violated the trial court's order. Furthermore, I believe the majority's holding eviscerates the purpose and goals of the Protection from Abuse Act, 23 Pa.C.S.A. §§ 6101–6118.

The issue in this case is whether appellant violated the PFA order by stating, "I'm going to kill this bitch." The majority engages in a discussion of what constitutes a threat only to conclude, what is exceedingly obvious, that the instant statement "can be viewed as threatening in nature." Despite this acknowledgement, the majority maintains that such a threat is permissible "as long as it did not occur in the plaintiff's presence or place her in fear." Based on the common and ordinary meaning of the word "threat" and the purposes the PFA Act was designed to advance, I believe it is clear that the presence of the victim or a communication to the victim is unnecessary.

The majority finds that appellant's conviction for contempt cannot be sustained because the PFA order in question was not definite, clear, specific and left doubt in the mind of appellant as to the conduct prohibited. Specifically, the majority maintains the term "threatening" found in the order can be interpreted as prohibiting a threatening statement which merely referred to the plaintiff, Ms. Naeemah Banks, or where such a statement is made in her presence or in some manner subject her to fear. Therefore, because the majority believes the order did not clearly and specifically preclude the conduct exhibited by appellant, it vacates his contempt conviction.

The PFA order provided that appellant "shall refrain from abusing, harassing, threatening and stalking the Plaintiff **or** placing her in fear of abuse in any place where she may be found." (emphasis added). The order does not require that appellant refrain from directly threatening Ms. Banks. In fact, because the above sentence is in the disjunctive, a reasonable interpretation of the phrase "in any place where she may be found" only refers to the prohibition against placing Ms. Banks in fear of abuse. Appellant was served with a PFA order which prohibited him from threatening Ms. Banks. Yet moments after he received the order, he felt it necessary to express his intention to kill her while still in the presence of the deputies. I believe it would be clear to any reasonable individual that such egregious conduct is prohibited by the court's order. Further, such conduct is an affront to the court's authority for which criminal contempt sanctions are appropriate. Therefore, I must disagree with the majority.

I find appellant's statement, "I'm going to kill this bitch," certainly falls within a reasonable person's ordinary understanding of what was prohibited by the order. I read the instant order to mean that a threat occurs when one utters words which are intended to convey a desire to inflict physical or other harm to the person the order was intended to protect and these words are communicated to

---

1. Baker said he was going to "kill this bitch." The suggestion anyone would be uncertain whether this falls within a prohibition of "threatening" her is a claim befitting a presidential spin doctor.

someone. *See United States v. Baish,* 460 A.2d 38 (D.C.1983) (adopting such a definition of "threat" in the context of the offense of making threats to do bodily harm.); *State v. Alston,* 75 Haw. 517, 865 P.2d 157 (Haw. 1994) (rejecting defendant's claim that threatening cannot occur if the threat is never communicated to the intended victim and holding that an intention to inflict harm may be conveyed to a third party to constitute a threat). In this case, the threat was communicated to the deputies. Furthermore, the absence of a requirement that the expression be communicated to the victim is consistent with the purpose and intent of the PFA Act.

As noted by the majority, the PFA Act is a vanguard measure designed to deal with the problems of domestic abuse. *Cipolla v. Cipolla,* 264 Pa.Super. 53, 398 A.2d 1053, 1054 n. 1 (Pa.Super.1979). The primary goal of the Act is to advance prevention of physical and sexual abuse. *Snyder v. Snyder,* 427 Pa.Super. 494, 629 A.2d 977, 981 (Pa.Super.1993). *Eichenlaub v. Eichenlaub,* 340 Pa.Super. 552, 490 A.2d 918, 922 (Pa.Super.1985); *see Lee v. Carney,* 435 Pa.Super. 405, 645 A.2d 1363, 1364 (Pa.Super.1994) (purpose of Act is to protect victims of domestic violence from the perpetrators of such abuse); *Yankoskie v. Lenker,* 363 Pa.Super. 448, 526 A.2d 429, 433 (Pa.Super.1987) (goal of the Act is to provide immediate protection from the threat of physical violence). In *Eichenlaub,* our Court quoted with approval the trial court's reflections as to the Act's purpose as applied to contempt proceedings under the Act:

> The emergency nature of the judicial process pursuant to the Protection from Abuse Act requires that this Court act swiftly to prevent continued abuse and deal with contempt situations in an expeditious manner lest the violation giving rise to the contempt become a criminal action for homicide. Faced with life and death situations, this Court must utilize its expertise in such matters to enforce its orders without the time delay in a jury trial.

*Eichenlaub,* 490 A.2d at 922, quoting slip op. of trial court at 11.

I believe it is necessary to interpret and define the term "threat" in light of the PFA Act's purpose. The purpose of imposing contempt sanctions for a violation of a PFA order forbidding one from threatening another is to prevent the ultimate harm such threats foretell. Therefore, once an individual, who is subject to such an order and who is given notice of its contents, has announced his intention to kill, I believe it is clear and would be clear to any person a violation of the order has occurred.

In this case, immediately after he was served and while in the presence of law enforcement officers, appellant uttered an intention to kill a woman the PFA order explicitly intended to protect. Under the majority's holding, law enforcement officers in similar circumstances would be restricted until a threat is communicated to the intended victim. Only then would it be sufficiently clear that threatening has occurred to constitute a violation of the order. To allow law enforcement officers to stand idly by while a person expresses his intent to kill because the intended victim is not present or has not yet been informed of his intent is absurd and in total contradiction of the Act's purpose to prevent imminent harm. Under the majority's rationale, if after hearing appellant's statement the deputies immediately telephoned Ms. Banks and informed her of what they heard only then would appellant's statement constitute a threat. Thus, law enforcement officials would be required to inform the intended victim before they could take any action. This is contrary to the Act's purpose of reacting to early signs of abuse and preventing more serious abuse from occurring. The Act's numerous provisions enable courts to respond quickly and flexibly to advance warnings of abuse. *Snyder,* 629 A.2d at 981. Requiring courts to fashion PFA orders so as to distinguish every conceivable type of conduct that is prohibited would not allow law enforcement officers to respond quickly to advance warnings of abuse and would eliminate a tool for combating domestic violence.

While it is true appellant in this case was incarcerated at the time he was served with the PFA order, this fact does not eliminate the existence of a threat because Ms. Banks was not in imminent danger. First, the rec-

ord does not indicate, nor have the attorneys provided any indication when appellant was to be released. He very well may have been able to carry out his threat against Ms. Banks shortly after he made the sfatement. Second, the expression of an intention to do harm is the violation of the order and does not require the present ability to carry out the threats. *See Commonwealth v. Ashford*, 268 Pa.Super. 225, 407 A.2d 1328 (Pa.Super.1979) (rejecting the defendant's contention that violation of the terroristic threats statute was not established because he was handcuffed and unable to carry out his threats against police officers). The fact appellant could not immediately kill Ms. Banks after he expressed his intention to do so does not eliminate the fact he made a threat. Finally, even if appellant was to remain in the York County Prison for an extended period of time, his expression of intention to kill Ms. Banks was an early sign of abuse to which the deputies reacted. Consequently, his statement constituted a threat and was a violation of the PFA order.

While inroads have been made in the judicial arena through PFA orders to protect victims and punish batterers, the majority opinion defeats the efforts targeted by these legal solutions. Victims of domestic abuse inherently rely on indirect criminal contempt sanctions as a remedy for violations of the PFA Act. The contempt road empowers abused victims and helps them escape from the violence. Taking away the force of contempt powers as the majority has done strips away from victims of domestic abuse protection from their abusers. Therefore, I would affirm the judgment of sentence.